UNITED STATES of America,
Plaintiff,

v.

INTERNATIONAL TELEPHONE AND
TELEGRAPH CORPORATION and
Grinnell Corporation, Defendants.

UNITED STATES of America,
Plaintiff,

v.

INTERNATIONAL TELEPHONE AND
TELEGRAPH CORPORATION and
The Hartford Fire Insurance Company,
Defendants.

Civ. Nos. 13319, 13320.

United States District Court
D. Connecticut.

Oct. 21, 1969.

Orders Oct. 30, 1969.

Joseph H. Widmar, Howard B. Myers and Donald J. Frickel, Attys., Dept. of Justice, Washington, D. C., Stewart H. Jones, U. S. Atty., and J. Daniel Sagarin, Asst. U. S. Atty., New Haven, Conn., for plaintiff United States in No. 13319.

James J. Coyle, William H. Rowan, Richard M. Clinton, Bruce A. Posnak and Seymour H. Dussman, Attys., Dept. of Justice, Washington, D. C., Stewart H. Jones, U. S. Atty., and J. Daniel Sagarin, Asst. U. S. Atty., New Haven, Conn., for plaintiff United States in No. 13320.

Henry P. Sailer, John H. Schafer and Charles E. Buffon, of Covington & Burling, Washington, D. C., Ralph C. Dixon and Richard M. Reynolds, of Day, Berry & Howard, Hartford, Conn., for defendant International Telephone and Telegraph Corp. in No. 13319.

Denis G. McInerney and William T. Lifland, of Cahill, Gordon, Sonnett, Reindel & Ohl, New York City, H. Meade Alcorn and Ralph G. Elliot, of Alcorn, Bakewell & Smith, Hartford, Conn., David D. McKinney, Gen. Counsel, Providence, R. I., for defendant Grinnell Corp. in No. 13319.

John H. Schafer, Henry P. Sailer and Charles E. Buffon, of Covington & Burling, Washington, D. C., Ralph C. Dixon and Richard M. Reynolds, of Day, Berry & Howard, Hartford, Conn., for defendant International Telephone and Telegraph Corp. in No. 13320.

Ralph C. Dixon and Richard M. Reynolds, of Day, Berry & Howard, Hartford, Conn., for defendant The Hartford Fire Insurance Co. in No. 13320.

## MEMORANDUM OF DECISION AFTER EVIDENTIARY HEARING ON MOTIONS FOR PRELIMINARY INJUNCTIONS

TIMBERS, Chief Judge:

### QUESTIONS PRESENTED

In these actions brought by the United States (government), pursuant to Section 15 of the Clayton Act, 15 U.S.C. § 25 (1964), for declaratory and injunctive relief to enjoin the proposed acquisitions by International Telephone and Telegraph Corporation (ITT) of the stock of Grinnell Corporation (Grinnell) and of the stock of The Hartford Fire Insurance Company (Hartford), on the ground that the effect of the proposed acquisitions may be substantially to lessen competition in violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (1964), the government's motions for preliminary injunctions present the following basic questions in each case:

(1) Whether the government has sustained its burden of establishing a reasonable probability of success in proving its case on the merits upon final hearing.

(2) Whether the alleged injury to the public interest resulting from denial of a preliminary injunction outweighs the alleged injury to defendants resulting from the granting of a preliminary injunction.

(3) Whether, under all the circumstances here present, the interests of the respective parties, as well as the public interest, would be best served by the entry of a hold separate order to preserve the status quo pending hearing and decision of the case on the merits.

For the reasons stated below, the Court denies the government's motions for preliminary injunctions and directs that hold separate orders be entered in each case.[1]

---

1. Each of the captioned cases is a separate action and has been treated as such throughout. To some extent, there are issues common to both actions, ITT being

## JURISDICTION

Jurisdiction with respect to the preliminary injunction relief sought is based upon Section 15 of the Clayton Act, 15 U.S.C. § 25 (1964), which authorizes at any time during the proceedings the issuance of an injunction to prevent and restrain a violation of Section 7 of the Clayton Act, 15 U.S.C. § 18 (1964).

## PRIOR PROCEEDINGS

The instant actions were commenced by the filing of complaints on August 1, 1969. They seek adjudications that the respective merger agreements, entered into between ITT and Grinnell on March 3, 1969 (No. 13,319) and between ITT and Hartford on April 8, 1969 (No. 13,320), violate Section 7 of the Clayton Act. Preliminary and permanent injunctions against carrying out the respective mergers likewise are sought. Answers have been filed by the defendants in each action.

The ITT-Grinnell merger agreement has been approved by the stockholders of both companies. The ITT-Hartford merger agreement has been approved by ITT's stockholders; but the meeting of Hartford's stockholders called for that purpose was adjourned to October 14, and subsequently to November 10.

Temporary restraining orders were not sought, the parties having stipulated that neither of the proposed mergers would be consummated without adequate prior notice. The Court construes this to mean there will be no consummation of either merger until the entry of orders on the pending motions for preliminary injunctions.

On August 6 the Court held a pre-trial conference with counsel at New Haven. A schedule was agreed upon for the serving and filing of papers in connection with the government's preliminary injunction motions. The motions themselves were filed on August 6 and August 21 in the *Grinnell* and *Hartford* cases, respectively. The last paper was filed on September 17.

On September 17 evidentiary hearings began at New Haven on the motions. They were concluded on September 23. Counsel agreed upon a schedule for serving and filing proposed findings of fact and conclusions of law, the last of which were filed on October 7.

The record before the Court consists of the pleadings; the government's motions for preliminary injunctions; some 328 documentary exhibits received in evidence at the hearings, including numerous affidavits; and the testimony of 9 witnesses who testified at the hearings. The Court has been greatly assisted by the briefs, oral arguments and proposed findings of fact and conclusions of law from able counsel for all parties.

## PARTIES TO THE ACTIONS [2]
*United States* (Government)

Plaintiff in each action is the United States acting through attorneys on the staff of the Antitrust Division of the Department of Justice and the United States Attorney for this District, all under the direction of the Attorney General. 15 U.S.C. § 25 (1964).

*International Telephone and Telegraph Corporation* (ITT)

ITT is a Delaware corporation. Its principal place of business is in New

---

the acquiring company in each. Consecutive hearings on the preliminary injunction motions were held, first in *Grinnell* and then in *Hartford*. While this consolidated opinion is being filed in both cases, it will deal separately with each case to the extent warranted.

2. A sufficient description of the corporate parties appropriate to a determination of the instant motions is set forth in this section of the opinion, generally regarding the nature of each company and its

business; and in subsequent sections of the opinion, more specifically regarding such aspects of each company's business as bear upon the claims of the respective parties.

Unless otherwise indicated in this opinion, the facts stated regarding the corporate parties and their respective businesses are facts as found by the Court based on the record before it and solely for purposes of the instant motions. Rule 52(a), Fed. R.Civ.P.

York City. It transacts business and is found in the District of Connecticut.

ITT is engaged in interstate and foreign commerce in the United States and abroad. Its business includes international telecommunications, overseas telephone operations and a variety of manufacturing and service enterprises. It employs approximately 300,000 persons.

ITT is the eleventh largest industrial corporation in the United States. During 1968 it had consolidated revenues of $4,066,502,000, consolidated net income of $192,404,000 and total assets of $4,022,400,000 at the end of that year.

ITT has 63,182,320 shares of common stock issued and outstanding in the hands of 144,053 shareholders. In addition, there are 64,483 holders of various issues of ITT preferred stock, all of which is convertible into ITT common stock.

In recent years ITT has grown with respect to both volume and diversification of business. During the period 1955 through 1968, its total sales increased from $502,760,050 to $4,066,502,000. During the past decade, it has grown by mergers and acquisitions until today it has approximately 200 subsidiaries engaged in a wide variety of enterprises.

During the period 1961 through 1968, ITT acquired or merged with 52 domestic and 55 foreign companies. Among its acquisitions during 1968 were Continental Baking Company, Sheraton Corporation of America, Levitt & Sons, Inc. and Rayonier, Inc.

Since January 1, 1969, ITT's Board of Directors has approved 22 domestic and 11 foreign acquisitions. Among its consummated 1969 acquisitions is the Canteen Corporation. Among its unconsummated 1969 acquisitions are the Grinnell Corporation and The Hartford Fire Insurance Company, subjects of the instant actions.

### Grinnell Corporation (Grinnell)

Grinnell is a Delaware corporation. Its principal place of business is in Providence, Rhode Island. It transacts business and is found in the District of Connecticut.

Grinnell is the 268th largest industrial corporation in the United States. During 1968 it had sales of $341,282,906, net income of $14,084,799 and assets of $184,453,229 at the end of that year.

Grinnell has 1,424,556 shares of common stock issued and outstanding in the hands of 5,939 shareholders.

In the two markets here claimed to be relevant,[3] Grinnell's products are as follows:

### Automatic Sprinkler Systems

Grinnell is the largest manufacturer and installer of automatic sprinkler fire protection systems in the United States. It manufactures most of the major components of its systems, with the exception of the piping (nothing to do with power piping) which it purchases. Its 1968 revenues from the manufacture and installation of such systems was $67,096,150.

3. Although the government alleged in its complaint in the *Grinnell* case probable lessening of competition in two other markets as a result of the proposed ITT-Grinnell merger, it has withdrawn its claims with regard to these markets on the instant preliminary injunction motion. Grinnell products involved in these two markets are:
*Power Piping Systems*
Grinnell is a leader in the power piping industry in the United States. Power piping (nothing to do with automatic sprinkler systems) involves fabrication and installation of piping systems in utility power generating plants and segments of the process industries, primarily chemical and paper. Grinnell is one of the three wholly integrated companies in the power piping industry, i. e. it manufactures its power pipe hangers and fabricates and installs its complete power piping systems. Its total sales in this market were $51,853,000 in 1967 and $28,380,000 in 1968.
*Power Pipe Hangers*
Grinnell is one of four companies engaged in the manufacture and sale of power pipe hangers in the United States. Power pipe hangers are specialized variable spring or constant support hangers used in power piping systems. They are precision engineered products which sell for as much as $2500 each. Grinnell's total sales of this product were estimated to be $5,970,000 in 1968.

*Pipe Hangers*

Grinnell is a leading manufacturer of pipe hangers in the United States. Pipe hangers are support devices from which piping is suspended. There are many different types, depending on the size and weight of the pipe to be suspended and the material from which the support is to hang. They vary from simple U-shaped pieces of wire to complicated suspension systems requiring precision engineering. They are standardized rather than custom built for specific application. Pipe hangers are necessary components of automatic sprinkler systems and of power piping systems. Grinnell distributes pipe hangers through its 37 branch warehouses located throughout the United States. It had total sales of $13,348,000 from pipe hangers in 1966.

*The Hartford Fire Insurance Company* (Hartford)

Hartford is a Connecticut corporation. Its principal place of business is in Hartford, Connecticut. It transacts business and is found in the District of Connecticut.

Among companies writing property and liability insurance through independent agents, Hartford ranks fourth in the United States; it ranks sixth among all property and liability insurance companies, including those which write directly. In 1968 it had premium receipts of $968,800,000, total adjusted operating income of $53,300,000 and consolidated assets of $1,891,700,000.

Hartford has 21,696,878 shares of common stock issued and outstanding in the hands of 18,661 shareholders.

Since 1960 Hartford has experienced substantial growth. Its net premiums increased from $531,995,000 in 1961 to $968,800,000 in 1968. From 1967 to 1968, its net premiums increased 10 per cent, its total adjusted operating income increased 24 per cent, its consolidated assets increased 9% and its policy holders surplus increased 10%. It has approximately $400,000,000 in surplus over the surplus required by law to be maintained to cover current insurance business (commonly referred to as "surplus surplus").

Although Hartford specializes in property and liability insurance, through a number of subsidiaries it also is engaged in the business of writing fire, marine, casualty, life and accident and health insurance, annuity contracts and surety bonds. It entered the life insurance field in 1959; by 1968 it had $2,400,000,000 of life insurance in force.

Prior to entering into the merger agreement with ITT here at issue, Hartford made a study of possible diversification and acquisition of a number of industrial firms.

### MERGER AGREEMENTS

The provisions of the respective merger agreements, to the extent relevant to the issues upon the instant preliminary injunction motions, may be summarized briefly.

*ITT-Grinnell Merger Agreement*

The ITT-Grinnell merger agreement provides that Grinnell, retaining its present name, will become a wholly owned subsidiary of ITT, the stockholders of Grinnell to become stockholders of ITT. Grinnell stockholders are to receive for each share of Grinnell common stock, 1.1 shares of ITT common stock and 1.2 shares of ITT cumulative preferred stock, $4.00 convertible Series K, each share of such ITT preferred stock to be convertible into 1.5625 shares of ITT common stock.[4]

---

4. Grinnell's proxy material for its annual meeting of August 5, 1969 (GX 1, p. 1) summarized these provisions of the merger agreement as follows:

"In summary, Grinnell stockholders would receive in the merger for each share of Common Stock of Grinnell, 1.1 shares of ITT Common Stock and 1.2 shares of ITT Cumulative Preferred Stock, $4.00 Convertible Series K. Each share of such Series K Preferred Stock would be entitled to a cumulative

The premium to be paid by ITT for each share of Grinnell stock, based on market values at the time of the hearing on the instant motions, is approximately $53 per share. Thus, the Grinnell stockholders stand to realize an aggregate gain of approximately $75,000,-000 if this merger is consummated.

The agreement provides for its termination if the board of either company determines that the merger "has become inadvisable or impracticable by reason of the institution . . . by . . . Federal governmental authorities . . . of material litigation . . . against Grinnell or ITT or both".[5] Both Grinnell and ITT have decided and have publicly announced that the merger agreement will be terminated in the event a preliminary injunction is issued enjoining consummation of the proposed ITT-Grinnell merger.

*ITT-Hartford Merger Agreement*

The ITT-Hartford merger agreement provides that Hartford will become a wholly owned subsidiary of ITT, the stockholders of Hartford to become stockholders of ITT. Hartford stockholders are to receive for each share of Hartford common stock, one share of ITT cumulative preferred stock, $2.25 convertible Series N, each share of such ITT preferred stock to be convertible into 1.25 shares of ITT common stock through September 1, 1972 and into 1.20 shares of ITT common stock thereafter.[6]

The premium to be paid by ITT for each share of Hartford stock, based on market values at the time of the hearing on the instant motions, is approximately $28 per share. Thus, the Hartford stockholders stand to realize an aggregate gain of approximately $600,000,000 if this merger is consummated.

The ITT-Hartford merger agreement has a provision similar to that in the ITT-Grinnell agreement with respect to termination in the event of material litigation.[7] ITT has decided and has publicly announced that the merger agreement will be terminated on its part in the event a preliminary injunction is issued enjoining consummation of the proposed ITT-Hartford merger.

CONTROLLING STATUTE:
SECTION 7 OF THE
CLAYTON ACT

The government's actions to enjoin the proposed ITT-Grinnell and ITT-Hartford mergers are brought under Section 7 of the Clayton Act, as amended in 1950, 64 Stat. 1125, which prohibits the acquisition by one corporation engaged in commerce of the stock of another corporation engaged in commerce "where in any line of commerce in any section of the country, the effect of such acquisi-

annual dividend of $4.00 and would be convertible into 1.5625 shares of ITT Common Stock. The Series K Preferred Stock is one of a number of series of Cumulative Preferred Stock, all of which enjoy preferences over ITT's Common Stock with respect to dividends and liquidation rights and in certain other respects."

5. GX 1 (Ex. A attached, Art. 7.1(e)).

6. ITT's proxy material for its annual meeting of June 26, 1969 (GX 43, p. 6) summarized these provisions of the merger agreement as follows:
"For each share of Hartford common stock issued and outstanding (excluding shares held in the treasury of Hartford Accident and Indemnity Company) on the date the transaction is con-

summated, ITT will issue and deliver one share of ITT Cumulative Preferred Stock, $2.25 Convertible Series N (without par value) ('ITT Convertible Preferred Stock Series N'). The ITT Convertible Preferred Stock Series N will (a) have cumulative annual dividends at a rate of $2.25 in cash each year, (b) have a liquidation preference of $34 per share in involuntary liquidation and $85 per share in voluntary liquidation, (c) be convertible into 1.25 shares of ITT Common Stock, $1 par value, through September 1, 1972, and 1.20 shares of ITT Common Stock thereafter, subject to adjustment in certain circumstances, and (d) be redeemable on and after September 1, 1976."

7. GX 43 (App. A attached, Art. 7.1(e)).

tion may be substantially to lessen competition . . . ." [8]

Congress intended amended Section 7 to apply to all types of mergers which have substantial anti-competitive effects. Brown Shoe Co. v. United States, 370 U.S. 294, 317 (1962); Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313–14 (1965). Basically there are three types of mergers: horizontal, vertical and conglomerate. By common definition, a horizontal merger is the acquisition of one company by another company producing the same product or similar product and selling it in the same geographic market; a vertical merger is the acquisition of one company which buys the product sold by the acquiring company or which sells the product bought by the acquiring company; and a conglomerate merger is a merger other than a horizontal or vertical merger. Conglomerate mergers have been classified as pure and mixed. Turner, *supra*, at 1315. Many mergers have the characteristics of more than one of these types of mergers. The proposed ITT-Grinnell and ITT-Hartford mergers are conglomerate mergers; but the government claims that the ITT-Hartford merger has horizontal and vertical, as well as conglomerate, aspects.

The statutory standard for determining if a merger violates Section 7 is whether its effect *"may be* substantially to lessen competition" (emphasis added). The statute thus deals with *probabilities. Brown Shoe, supra,* at 323. The test is whether it is probable that the merger will have an anti-competitive effect.

Section 7 is not concerned with *certainties.* Since it is designed to stop anti-competitive practices "in their incipiency", there is no requirement that

"the anti-competitive power manifest itself in anti-competitive action before § 7 can be called into play." FTC v. Procter & Gamble Co., 386 U.S. 568, 577 (1967).

Although Section 7 is not concerned with certainties, it also is not concerned with *possibilities.* "The statute is concerned only with those mergers which may have demonstrable and substantial anti-competitive effects." United States v. Atlantic Richfield Co., 297 F.Supp. 1061, 1066 (S.D.N.Y.1969); see *Brown Shoe, supra,* at 323.

I

ITT-GRINNELL MERGER

The government seeks a preliminary injunction to enjoin the proposed ITT-Grinnell merger. The Court is authorized by Section 15 of the Clayton Act to issue an injunction, at any time during the proceedings, to prevent and restrain violations of the Act, including Section 7.

A preliminary injunction will not issue unless the government has established a reasonable probability of success in proving a Section 7 violation at trial. United States v. Ingersoll-Rand Co., 320 F.2d 509, 525 (3 Cir. 1963); United States v. Atlantic Richfield Co., 297 F. Supp. 1061, 1067 (S.D.N.Y.1969); United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 545 (N.D.Ill.1968); United States v. Chrysler Corp., 232 F. Supp. 651, 657 (D.N.J.1964); United States v. Crocker-Anglo National Bank, 225 F.Supp. 849, 850 (N.D.Cal.1963).

The initial step, therefore, in deciding whether to issue a preliminary injunction to enjoin the proposed ITT-Grinnell merger, is to measure against the probability of success standard each of the specific claims upon which the govern-

8. 15 U.S.C. § 18 (1964):
"No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly."

ment relies in asserting that the proposed merger will substantially lessen competition.

The government's contention that the proposed ITT-Grinnell merger will have substantial anti-competitive effects is based upon the following specific claims:

(1) That the proposed merger will confer various marketing and promotional competitive advantages upon Grinnell which it would not otherwise have and which its competitors do not have.

(2) That the proposed merger raises the probability of reciprocal dealing by creating a market structure conducive to such dealing.

Each of these specific claims will now be considered and in the order set forth above.

### (1) Claim of Marketing and Promotional Competitive Advantages

One of the government's primary claims regarding the proposed ITT-Grinnell merger is that Grinnell, as the dominant competitor in several lines of commerce, will derive various marketing and promotional competitive advantages from the merger which will further entrench its position of dominance by raising barriers to entry to the relevant markets and discouraging smaller competitors from aggressively competing. The effect of such a merger, the government claims, will be substantially to lessen competition.

The legal basis for this claim is a line of cases beginning with FTC v. Procter & Gamble Co., 386 U.S. 568 (1967). In *Procter & Gamble,* the FTC challenged a merger between Procter & Gamble, the largest manufacturer of household liquid bleach, and Clorox, the dominant competitor in its field accounting for 50% of total industry sales. One of the FTC's chief arguments was that Procter & Gamble, a much larger company than Clorox and a large advertiser, was able to obtain quantity advertising discounts and would use such discounts to advantage over its competitors in ad-

vertising Clorox. The Supreme Court held that the merger violated Section 7 on the ground, in part, that "[T]he substitution of the powerful acquiring firm for the smaller, but already dominant, firm may substantially reduce the competitive structure of the industry by raising entry barriers and by dissuading the smaller firms from aggressively competing." 386 U.S. at 578. In so holding, the Court noted that the merger was anti-competitive because "Procter would be able to use its volume discounts to advantage in advertising Clorox" and "[t]hus, a new entrant would be much more reluctant to face the giant Procter than it would have been to face the smaller Clorox." 386 U.S. at 579.

Similarly, in General Foods Corp. v. FTC, 386 F.2d 936 (3 Cir. 1967), cert. denied, 391 U.S. 919 (1968), the acquisition of S.O.S., a soap pad manufacturer and one of two firms which dominated that industry, by General Foods, a producer and distributor of packaged foods, was held to violate Section 7. The decision turned on the ground, among others, that S.O.S. gained a competitive advantage as a result of the merger because General Foods, a major national advertiser, was able to advertise and promote S.O.S. less expensively than S.O.S. had been able to do itself prior to the merger. The Court held that this would serve further to entrench S.O.S. in its leading market position.

■ Mergers from which a dominant company will derive a marketing and promotional advantage other than volume advertising also have been held to violate Section 7. In United States v. Ingersoll-Rand Co., 320 F.2d 509 (3 Cir. 1963), the government sought an injunction against a partially conglomerate merger alleged to be in violation of Section 7. The merger involved the acquisition of three leading manufacturers of underground coal mining machinery by Ingersoll-Rand, a large manufacturer of industrial machinery. The Third Circuit upheld the injunction issued by the district court on the ground, among others, that "Ingersoll-Rand, by dominating the en-

tire field of underground coal mining machinery, will be in a position to offer a complete line of equipment to its consumers and to further enhance its position and dominance in the market by extending consumer financing to prospective purchasers through its wholly owned subsidiary finance company." 320 F.2d at 524. Accord: Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., 414 F.2d 506 (3 Cir. 1969), cert. denied, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); United States v. Wilson Sporting Goods Co., 288 F.Supp. 543 (N.D.Ill.1968).

The cases cited above indicate that when a company which is the dominant competitor in a relatively oligopolistic market is acquired by a much larger company, such acquisition violates Section 7 if the acquired company gains marketing or promotional advantages which will entrench or increase its dominant market position.

Against this background of the decisional law in this area, the government's claim in the instant case with respect to competitive advantages raises two basic factual questions. First, is Grinnell the dominant competitor in the lines of commerce relied on by the government? Second, will the proposed merger give Grinnell the competitive advantages claimed by the government?

Turning to the question of Grinnell's dominance, the first step in determining whether Grinnell is a dominant competitor in relatively oligopolistic markets is to define the relevant product and geographic markets. The government appears to rely on two product markets:[9] automatic sprinkler systems, with the manufacture of sprinkler devices and the installation of sprinkler systems constituting relevant submarkets; and pipe hangers, with several product submarkets. The government asserts that the relevant geographic market is the national market. While the government does not define the relevant markets as fully or precisely as required by controlling law, see Brown Shoe Co. v. United States, 370 U.S. 294, 325–28 (1962), nevertheless, for purposes of the instant preliminary injunction motion, the Court accepts the government's claim as to the relevant product and geographic markets involving Grinnell.

The next step is to determine whether Grinnell is the dominant competitor in these markets and whether these markets are oligopolistic in nature. The government has introduced considerable statistical data in support of its claim that Grinnell is the dominant competitor in the sprinkler industry and in the pipe hanger industry. The lack of organization and correlation of such data, together with its fragmentary nature, has made exceedingly difficult the Court's task of properly assessing its value with relation to the question to be determined. Nevertheless, the Court has reached certain conclusions based on the evidence presented.

As for the manufacture of sprinkler devices, there is uncontroverted evidence that Grinnell is the leading manufacturer in the United States.[10] There also is evidence that Grinnell controls less than 25% of the market; and that it has three sizable competitors, together with a number of smaller ones who maintain a position in the market.[11] While Grinnell may be the leading manufacturer, this evidence does not support a finding of dominance. The mere fact of Grinnell's large size does not establish dominance in a market apparently as balanced and with as many competitors as this one.

As for the installation of sprinkler systems, the statistical data introduced by the government indicates that Grinnell's share of the market is in excess of 25%; and that it has two sizable competitors.[12] While this evidence in-

9. *Supra* pp. 771–772 and n. 3.

10. GX 25; GX 67; DX 1, ¶ 2.

11. GX 25; GX 67; Affidavit of G. Noe, ¶ 25.

12. GX 15; GX 18; GX 23; GX 25; GX 26; GX 27; GX 67; Affidavit of G. Noe, ¶¶ 27–30; DX 7.

dicates that Grinnell's share of the market is larger in the installation of sprinkler systems than in the manufacture of sprinkler devices and that its competitors are not as close in installation as in manufacture, such evidence still does not establish that Grinnell is dominant in the installation market.[13]

Finally, as for pipe hangers, the statistical data does make a prima facie showing that Grinnell is the dominant competitor in this market and that it is an oligopolistic market.[14]

In short, the most that can be said regarding the evidence introduced relative to the government's claim that Grinnell is the dominant competitor in several oligopolistic markets is that the evidentiary record at this stage of the proceedings appears to establish that Grinnell is the dominant competitor in the pipe hanger market, but does not permit a finding that Grinnell is the dominant competitor in the automatic sprinkler market.

Assuming that Grinnell could be characterized as the dominant competitor in any of the relevant product markets, there remains the question whether Grinnell will gain the competitive marketing and promotional advantages claimed by the government to result from the proposed merger. In this regard, the government claims that Grinnell will gain competitive advantages as a result of the merger in the following specific respects:

(a) Through creation of an opportunity to engage in system or package selling.

(b) Through affiliation with Hartford.

(c) Through access to ITT's financial resources.

(d) Through foreclosure of Grinnell's competitors from foreign sales.

(a) Package or System Selling

The government claims that the merger will lessen competition within the meaning of Section 7 because it will give Grinnell a competitive marketing advantage by creating an opportunity for Grinnell to include additional products in its line and to engage in package or system selling.[15] The government's claim in this regard embraces both automatic sprinklers and pipe hangers; but only automatic sprinklers will be discussed here in detail, since the government's assertion concerning the opportunity for package selling of sprinklers is representative, and there is more evidence as to this product than with respect to package selling of pipe hangers.

Underlying the claim concerning package selling of sprinklers is the contention that the proposed merger will create an opportunity for such selling in that sprinklers could be offered in a package with ITT plumbing, heating and air conditioning products. In support of this contention, the government has introduced affidavits to the effect that sprinklers could be included in an overall plumbing, heating and air conditioning package;[16] and that ITT, through its Technical Industrial Products Group, is a leading factor in various areas of the

---

13. Among other critical missing evidence, is any showing of the number of other competitors in the installation market.

14. GX 8, p. 1; GX 42, p. 9; GX 68.

15. In effect, the government's contention is that this is a mixed or product extension conglomerate merger. Such a merger has been defined as one involving the acquisition of a company manufacturing or selling a product "related to a product or products of the acquiring firm because it can be produced with much the same facilities, sold through

the same distribution channels, or made a part of the same research and development efforts." Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1315 (1965). See Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., 414 F.2d 506, 518 (3 Cir. 1969) cert. denied 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); General Foods Corp. v. FTC, 386 F.2d 936, 944 (3 Cir. 1967), cert. denied, 391 U.S. 919 (1968).

16. GX 12, ¶ 5; GX 79, ¶¶ 2, 3; GX 80, ¶¶ 2, 3.

heating, air conditioning and industrial controls field.[17]

Defendants, on the other hand, challenge the government's contention that the merger will create the opportunity for package selling of sprinklers. They have introduced affidavits directly contradicting the government's affidavits on this point. Defendants' affidavits are mainly from executive officers of Grinnell competitors. For example, according to one of defendants' affidavits, sprinkler installation is a specialty business that does not lend itself to integration with sales of other products or services.[18] On this point, one of the government's affidavits states that "it is generally required that a specialty sprinkler contractor" do sprinkler work.[19] Another of defendants' affidavits is to the effect that sprinkler installers generally do not take on other forms of contracting; and that they specialize in sprinkler work because it has been their experience that this is the most successful way of conducting their business.[20] Still another of defendants' affidavits states that there are no opportunities for package selling of sprinkler installations with other products because sprinkler work is almost always awarded on the basis of bids, and bid solicitations are usually confined to sprinkler installations.[21] In addition, defendants have introduced another affidavit stating that, although Grinnell presently is in a position to offer sprinklers in a package with plumbing, heating and air conditioning products inasmuch as it handles these products through its nationwide warehousing system, it has not done so.[22] Defendants point to this as indicative that

there is no competitive advantage in package selling of sprinklers.

In short, the evidence as to whether the merger will create an opportunity for package selling of sprinklers at best is conflicting. It consists wholly of affidavits from both sides. There is no basis upon which the Court would be warranted in giving more weight to those of the government than to those of defendants. General Electric Co. v. American Wholesale Co., 235 F.2d 606, 608–9 (7 Cir. 1956); Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3 Cir. 1940); Hershey Creamery Co. v. Hershey Chocolate Corp., 269 F.Supp. 45, 57 (S.D.N.Y.1967). And the government's case with regard to package selling of sprinklers is representative of its case with regard to pipe hangers; if anything, the former is stronger than the latter.

Consequently, while recognizing the possibility that the government at trial may establish that Grinnell will derive a competitive advantage from the proposed merger in the form of opportunities for package or system selling, on the present state of the record at this stage of the proceedings the Court is not able to make a finding that the government has established a probability of success upon final hearing with respect to its package or system selling claim.

(b) Affiliation with Hartford

The government also contends that Grinnell will gain competitive advantages from the proposed ITT-Grinnell merger through affiliation with Hartford. Although the government advances various arguments [23] in support

---

17. Affidavit of S. Aronow, ¶¶ 8–16; GX 1, p. 19; GX 2, p. 8.

18. DX 4, ¶ 2.

19. GX 80, ¶ 2.

20. DX 7, ¶ 5.

21. DX 2, ¶ 6.

22. DX 1, ¶ 12.

23. The government's other arguments are:
 (1) That Hartford might assist Grinnell in securing sales by varying its sprinkler specifications so as to favor Grinnell.
 (2) That Hartford might assist Grinnell in securing sales by giving more favorable fire insurance premium rates to customers purchasing Grinnell sprinkler systems.
 (3) That the ITT-Hartford merger may inspire additional insurance-sprinkler mergers with resultant increases in concentration and a threat to the continued existence of those sprink-

of this contention, its chief argument is that, since the fire insurance and automatic sprinkler industries are closely related, Hartford would be in a position to assist Grinnell in securing sales by recommending Grinnell sprinkler systems to its fire insurance customers. This being the government's strongest argument, it will be discussed in detail, to the exclusion of the others.

The government's position in essence is that Grinnell's selling advantage will be enhanced through its affiliation with Hartford because presumably Hartford can use its position and influence with the companies to which it sells fire insurance to secure business for Grinnell.

The government's contention raises two factual questions. First, will Hartford in fact have the opportunity to recommend Grinnell sprinkler systems to the companies to which it sells fire insurance? Second, would such a recommendation in fact help Grinnell in securing business and have the effect of foreclosing to Grinnell's competitors a substantial share of the sprinkler market?

As for Hartford's opportunity to recommend Grinnell sprinkler systems to its fire insurance customers, the evidence does not clearly establish that Hartford will have such opportunity. While there is considerable evidence that fire insurance agents are in a position to recommend sprinkler systems to their customers,[24] there also is evidence that much of Hartford's fire insurance is written through independent agents who represent a number of companies.[25]

The government's evidence that such agents would have the incentive, and would be willing, to recommend sprinkler systems of an affiliate of an insurance company they represent is inconclusive at best.[26] And defendants have introduced substantial evidence to the contrary.[27]

Defendants' evidence also shows that many automatic sprinkler systems are installed in large buildings insured by insurance pools.[28] This evidence indicates that such pools give sprinkler specifications, but do not recommend manufacturers and installers, and are not subject to the control of a particular insurer such as Hartford.[29] From such evidence it does not appear that these pools would recommend Grinnell sprinklers simply because of Grinnell's affiliation with Hartford.

Assuming that Hartford and the agents who represent Hartford do have the opportunity to recommend Grinnell sprinklers, the evidence does not clearly establish that such recommendations would be likely to help Grinnell secure business and foreclose Grinnell's competitors from a substantial share of the market. There is evidence that, since many sprinkler contracts are awarded on the basis of competitive bids, recommendations of a fire insurance company or its agents would have little or no effect; the controlling factor is the bid rather than a recommendation.[30] There also is evidence that, since a large proportion of sprinkler work is ordered through general contractors or architects, a recommendation of a particular

---

ler companies unable to find suitable merger partners.

(4) That Hartford's surplus will be available to aid Grinnell's future expansion and thereby further entrench Grinnell as the dominant competitor in the sprinkler industry to the detriment of smaller competitors. *Infra,* pp. 791–792.

24. GX 11, ¶ 14; GX 64; GX 82, ¶ 7; DX 5, ¶ 3; DX 16, ¶ 4; DX 22, ¶ 2.

25. DX 31, ¶ 7.

26. *Compare* GX 36 and 37 *with* DX 14 and 15; see GX 57, ¶ 7; GX 59, ¶ 5(e); GX 61; GX 63; GX 64; GX 81, ¶ 5; GX 82, ¶ 7.

27. DX 16, ¶ 4; DX 18, ¶ 5; DX 20, ¶ 3; DX 21, ¶ 2; DX 23, ¶ 3; DX 24, ¶ 2.

28. DX 16, ¶ 9; DX 21, ¶ 5; DX 29, ¶ 2; DX 34, ¶ 4.

29. DX 16, ¶ 9; DX 26, ¶ 2; DX 29, ¶¶ 3, 4.

30. DX 3, ¶ 6; DX 5, ¶ 3; DX 16, ¶ 6; DX 23, ¶ 3; DX 29, ¶ 3.

sprinkler system by a fire insurance company or its agents would be misplaced; general contractors and architects are generally familiar with the available sprinkler systems and do not depend on recommendations by insurance companies or agents in determining which system to order.[31] Finally, there is some evidence indicating that a Hartford-Grinnell affiliation might even be disadvantageous to Grinnell in this sense: agents who do not represent Hartford might be reluctant to recommend sprinklers made or installed by Grinnell, an affiliate of a competitor, even though under other circumstances they might make such a recommendation.[32]

In short, the evidence does not establish that Grinnell would in fact derive competitive advantages from the proposed ITT-Grinnell merger through affiliation with Hartford. The government's argument that Hartford would be able to recommend Grinnell sprinkler systems to its fire insurance customers is representative of—and, if anything, stronger than—the other arguments it advances in support of its claim that Grinnell will gain various competitive advantages from the proposed merger through affiliation with Hartford. The record similarly fails to establish a factual basis for the government's additional arguments.

Whatever the possibilities may be of the government being able to prove at trial its claim with respect to the alleged competitive advantages Grinnell will derive from such an affiliation with Hartford, the record at this stage of the proceedings clearly does not permit a finding that the government has established a reasonable probability of success with respect to this claim at final hearing.

(c) Access to ITT's Financial Resources

The government further contends that Grinnell will gain a competitive market-ing advantage through access to ITT's financial resources; and that such resources will enable Grinnell to finance credit sales of its sprinklers, to expand its leasing plan for sprinklers and to increase its advertising and sales promotion. Whether access to ITT's financial resources in fact would give Grinnell a competitive advantage is highly doubtful on the present record.

Defendants have introduced evidence that Grinnell already is in a position to offer credit and leasing arrangements to purchasers of sprinkler systems without assistance from ITT;[33] and that Grinnell already is in a position substantially to expand its advertising but has refrained from doing so because it does not believe it would be beneficial.[34] Under these circumstances, defendants point out that access to ITT's financial resources can hardly be viewed realistically as a competitive advantage since Grinnell is fully capable of engaging in financing, leasing and advertising to the extent it wishes even if the merger does not occur. Cf. United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 553 (N.D.Ill.1968).

The government has not established a reasonable probability of success with respect to its financial resources claim at final hearing.

(d) Foreclosure of Grinnell's Competitors from Foreign Sales

Finally, the government contends that Grinnell will derive a marketing and promotional competitive advantage from the proposed ITT-Grinnell merger in that ITT will be able to assist Grinnell in overseas expansion, leading to a foreclosure of Grinnell's competitors from foreign markets.

The legal basis for this claim is doubtful, since Section 7 proscribes acquisitions the effect of which may be substantially to lessen competition "in any section of the country." While the

---

31. DX 19, ¶ 2; DX 20, ¶ 2; DX 27, ¶ 3.

32. DX 19, ¶ 4.

33. DX 1, ¶ 13.

34. *Id.*

government asserts that foreclosure of Grinnell's competitors from foreign markets will result in substantial lessening of competition in the domestic market, the record is barren as to precisely how this will occur.

Moreover, the factual basis for the government's claim is questionable inasmuch as the evidence concerning the assistance which ITT would be able to give Grinnell in foreign expansion and Grinnell's present position in foreign markets is conflicting and inconclusive.[35]

The government has not established a reasonable probability of success at final hearing with respect to its claim of foreclosure of Grinnell's competitors from foreign sales.

### (2) *Claim of Reciprocal Dealing*

In addition to its claim that the proposed ITT-Grinnell merger will substantially lessen competition by conferring marketing and promotional competitive advantages on Grinnell, the government also claims that the proposed merger will give rise to reciprocal dealing by creating a market structure conducive to "reciprocity" and "reciprocity effect".

As used here, reciprocity refers to a seller's practice of utilizing the volume or potential volume of its purchases to induce others to buy its goods or services; and reciprocity effect refers to the tendency of a company selling or desiring to sell to another company to channel its purchases to that company.

The government asserts that as a result of the proposed merger ITT will be able to exert pressure on its suppliers to transfer their purchases of automatic sprinklers and pipe hangers to Grinnell by conditioning ITT's purchases of supplies on the suppliers' agreement to purchase Grinnell's products. The government asserts that, even if there were no pressure from ITT, its suppliers nevertheless would tend to transfer their purchases of automatic sprinklers and pipe hangers to Grinnell in order to gain favor with ITT.

While the government claims that Grinnell is likely to be a substantial beneficiary of reciprocal purchasing arrangements involving both automatic sprinklers and pipe hangers, its claim with respect to sprinklers is stronger and supported by more substantial evidence than its claim concerning pipe hangers. Accordingly, only the sprinkler claim will be discussed here in detail.

The factual basis for the government's claim with respect to reciprocal dealing rests on the theory that the proposed merger will create a market structure conducive to such dealing. The government contends that ITT suppliers are significant actual or potential purchasers of sprinklers; and it asserts that, since they are significant purchasers, the proposed merger will create an opportunity for reciprocal purchasing arrangements involving sprinklers.

In support of this contention, the government has introduced statistical data showing that ITT is a substantial purchaser of goods and services from numerous domestic suppliers, including some of the nation's leading industrial concerns.[36] Specifically, the government's evidence shows that in a given year ITT purchased at least $350,000,000 of goods and services from industries which account for 28% of total new plant and equipment expenditures by all United States industries, and 67% of total new plant and equipment expenditures by all manufacturing industries.[37] This evidence is essentially undisputed by defendants.

Defendants, however, assert that in most instances the individuals responsible for making sprinkler purchasing decisions do not have any supplier relationship with ITT. Defendants' evidence shows that approximately 30% of automatic sprinkler systems are sold to educational institutions, hospitals, retail

---

35. GX 6, pp. 3, 7; GX 15, ¶ 6; GX 34, p. 2; GX 85, ¶¶ 3, 4; DX 1, ¶ 3; DX 13, ¶ 2.

36. Affidavit of G. Noe, ¶¶ 13–19, GX 49– GX 53.

37. Affidavit of G. Noe, ¶¶ 20, 21; GX 54.

establishments and other non-industrial organizations, none of which are significant ITT suppliers; and that approximately 80% of the remaining sales are made in connection with new construction where sprinkler work is done on a bid basis by general or mechanical contractors who are not significant ITT suppliers either as a group or individually.[38] Defendants point out, therefore, that while the ultimate purchasers of sprinkler systems may be ITT suppliers, they have nothing to do with the actual purchasing; and that the immediate purchasers of sprinkler systems are not ITT suppliers. Thus, although ITT suppliers represent a significant market for sprinklers, the evidence shows that most of the actual purchasers of sprinklers are not ITT suppliers.

Moreover, the question of whether a merger will create an opportunity for reciprocal dealing is complex. The answer depends on many variables. The extent to which ITT suppliers are actual or potential purchasers of sprinklers is not the only factor relevant to a determination of whether the proposed merger will result in the creation of an opportunity for reciprocal dealing. Other relevant factors are whether sprinklers have product characteristics which lend themselves to reciprocal dealing; the scope of the market, represented by ITT, for products sold by ITT suppliers; the size and diversification of other companies to which ITT suppliers sell their products; and the degree to which the markets within which ITT suppliers operate are competitively structured. Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1387–88 (1965); Brodley, Oligopoly Power Under the Sherman and Clayton Acts, 19 Stan.L.Rev. 285, 327 (1967). In connection with most of these critical factors, little or no evidence has been offered on the instant preliminary injunction motion.

In short, the inconclusive record at the present stage of the proceedings does not permit the Court to make a finding as to whether the proposed merger will create a market structure conducive to reciprocal dealing.

Even if the proposed merger were to create an opportunity for reciprocal dealing, it does not necessarily follow that such dealing will in fact occur, as the government claims. The evidence introduced by the government in support of its position that such dealing will occur consists mainly of an economist's affidavit containing general statements to the effect that reciprocity is a common business practice,[39] and affidavits from some of Grinnell's competitors expressing fears that it will occur.[40] The former does not deal directly with the practice of reciprocity in relation to the sprinkler business; the latter consist primarily of conclusory and speculative statements which simply infer that reciprocity will occur if the merger creates an opportunity for it. Such affidavits are of doubtful probative value. Nor has the government shown either that possible reciprocal dealing advantages played a part in the decision of ITT and Grinnell to merge, or that the parties to the merger practice reciprocity.

Defendants, on the other hand, have introduced considerable evidence to the effect that, even if the merger were to create an opportunity for reciprocal dealing, they would not avail themselves of such opportunity; and that reciprocity effect is unlikely. Defendants' uncontroverted evidence shows that ITT has a written policy against reciprocity which has been disseminated to its purchasing and sales personnel;[41] and that ITT does not collect purchasing and sales data necessary to identify reciprocal purchasing opportunities.[42]

Furthermore, defendants have adduced evidence that the "profit center" con-

---

38. DX 1, ¶5; DX 3, ¶6; GX 11, ¶4.

39. GX 87, pp. 3–6.

40. GX 82, ¶8; GX 81, ¶7; GX 11, ¶18.

41. DX 35, ¶11.

42. DX 35, ¶11; GX 87, p. 7.

cept, around which ITT is organized, is not conducive to reciprocity.[43] Under this concept each division and subsidiary has its own separate decentralized purchasing and sales department. The compensation and promotion of the individuals who manage each profit center is determined by the performance of their own profit center, not by the performance of ITT as a whole.[44] Affidavits by Mr. Geneen, President of ITT, and Mr. Backman, an economist, bear this out: that the management of each profit center would resist reciprocal dealing arrangements because they would only increase the volume and profits of other profit centers and often would result in purchases of more expensive and poorer quality goods by the profit center which engaged in such reciprocity.[45]

Finally, defendants point out that reciprocity effect is unlikely, given ITT's anti-reciprocity policy, implemented by the withholding of purchasing and sales data and the organization of ITT around the profit center concept; and that, even if ITT suppliers on their own initiative were to purchase sprinkler systems and pipe hangers from Grinnell without pressure from ITT in an effort to gain favor with ITT and to obtain reciprocal sales, such suppliers would find that their purchases would not have the desired effect for the reasons just stated, and they would soon discontinue such abortive efforts.[46]

The substantial, credible evidence introduced by defendants to the effect that reciprocal dealing is unlikely, even if the proposed merger were to create the opportunity for such dealing, precludes any finding based on what amounts to an inference suggested by the government that reciprocal dealing will occur.

Accordingly, since the record as it now stands does not establish either the extent to which the proposed merger will create a market structure conducive to reciprocal dealing or the extent to which reciprocal dealing will occur if the merg-

er were to create an opportunity for such dealing, the Court holds that the government has not demonstrated a reasonable probability of success at final hearing in establishing the factual basis for its claim with respect to reciprocal dealing.

Even if the government had established a factual basis for its claim with respect to reciprocal dealing, it still would be required to demonstrate a reasonable probability of success in establishing the legal basis for such claim.

The government contends as a matter of law that, once it has shown a merger will create an opportunity for reciprocity dealing, that is sufficient to halt the merger under Section 7. In support of its position, the government relies on FTC v. Consolidated Foods Corp., 380 U.S. 592 (1965); Allis-Chalmers Mfg. Co. v. White Consolidated Industries, Inc., 414 F.2d 506 (3 Cir. 1969), cert. denied, 396 U.S. 1009, 90 S.Ct. 567, 24 L.Ed.2d 501 (1970); United States v. Ingersoll-Rand Co., 320 F.2d 509 (3 Cir. 1963); United States v. General Dynamics Corp., 258 F.Supp. 36 (S.D. N.Y. 1966). These decisions, however, in the opinion of this Court, are readily distinguishable from the instant case.

The Supreme Court in *Consolidated Foods* held that a merger which gives rise to reciprocal dealing violates Section 7. In so doing, it affirmed the FTC determination that the acquisition of Gentry, Inc., a manufacturer of dehydrated onion and garlic, by Consolidated Foods, a large food wholesaler, made possible reciprocal dealing on the part of Consolidated, its suppliers and Gentry. Since Consolidated was a large purchaser of the products of food processors who in turn purchased dehydrated onion and garlic for use in their products, the Court held there was an opportunity for reciprocity arrangements as a result of the merger. Significantly, from the standpoint of the instant case, the Court

---

43. DX 35, ¶ 10; DX 37, pp. 3–4.

44. *Id.*

45. *Id.*

46. DX 35, ¶ 12.

was not required to pass on the question of whether a mere showing that a merger will create a market structure favorable to reciprocal dealing, standing alone, is sufficient to proscribe a merger under Section 7, because there also was post-acquisition evidence of efforts by Consolidated to induce its suppliers to enter into reciprocal purchasing arrangements. The majority opinion does state that "[r]eciprocal trading may ensue not from bludgeoning or coercion but from more subtle arrangements", 380 U.S. at 594; and this could be interpreted to mean that evidence of an actual reciprocity program is not a prerequisite for a Section 7 violation. Mr. Justice Stewart, however, stated in his concurring opinion:

"Clearly the opportunity for reciprocity is not alone enough to invalidate a merger under § 7. The Clayton Act was not passed to outlaw diversification." 380 U.S. at 603.

*Consolidated Foods* was followed by the district court in *General Dynamics*, where the acquisition of Liquid Carbonic, a producer and distributor of carbon dioxide and carbon dioxide products, by General Dynamics, a large manufacturer, was held to violate Section 7 because it resulted in reciprocal dealing. *General Dynamics* is similar to *Consolidated Foods* in that in both cases the showing with respect to the probability of reciprocity was not limited to evidence that the proposed mergers created merely an opportunity for reciprocal dealing. In *General Dynamics* there was post-acquisition evidence of an actual reciprocity program, as well as evidence that the opportunity to engage in reciprocal dealing was one of the primary motives for the acquisition of Liquid Carbonic by General Dynamics.

In the instant case, in contrast to *Consolidated Foods* and *General Dynamics*, the showing with respect to the probability of reciprocal dealing is essentially limited to evidence that the merger will create a market structure conducive to reciprocal dealing practices. There is little or no evidence of any actual reciprocity program; of plans for a reciprocity program; that reciprocity has been or is practiced by ITT, its suppliers, or Grinnell; or that reciprocity is common in the automatic sprinkler and pipe hanger industries.

*Ingersoll-Rand* and *Allis-Chalmers*, unlike *Consolidated Foods* and *General Dynamics*, do reach the question of whether the creation of an opportunity to enter into reciprocity arrangements as the result of a merger is sufficient standing alone to support a finding of a Section 7 violation. In *Ingersoll-Rand*, the Third Circuit upheld the granting of a preliminary injunction enjoining the acquisition of three leading manufacturers of underground coal mining machinery by Ingersoll-Rand, a large manufacturer of industrial machinery, on the ground, among others, that the acquisition created an opportunity for reciprocity. After noting that Ingersoll-Rand was a large steel purchaser and that the steel industry was one of the largest markets for coal, the court quoted with approval from the opinion of the district court as follows:

"It is not overly speculative to assume that the judicious use of its steel-purchasing power by Ingersoll-Rand could immeasurably increase the sales by the acquired companies of machinery and equipment to the coal mining companies which acutely need the continued goodwill of the steel industry. *Moreover, the mere existence of this purchasing power might make its conscious employment toward this end unnecessary; the possession of the power is frequently sufficient, as sophisticated businessmen are quick to see the advantages in securing the goodwill of the possessor.* Certainly the steel producer who seeks orders from Ingersoll-Rand may tend to prefer the acquired companies as the source of supply of equipment used in his 'captive' mines, and the advantages accruing to him from so favoring the acquired companies would not have to be pointed out by Ingersoll-Rand. What may

here be involved is the trade practice known as 'Reciprocity'." 320 F.2d at 524 (Emphasis added)

*Allis-Chalmers* is to the same effect. There the Third Circuit ordered that a preliminary injunction be issued against the acquisition of Allis-Chalmers, a diversified manufacturing company, by White Consolidated Industries, a larger diversified manufacturer, on the ground, in part, that the acquisition would create an opportunity for reciprocal dealing in that Allis-Chalmers and White were major purchasers of steel from steel companies which were principal customers of a White subsidiary. The court stated:

"An acquisition which creates a market structure conducive to reciprocal dealing presents the acquiring company with an advantage over competitors, an advantage which by its very nature is anticompetitive [citing *Consolidated Foods*]." 414 F.2d at 518.

While *Ingersoll-Rand* and *Allis-Chalmers* lend strong support to the theory that a merger which will bring about a market structure favorable to reciprocal dealing offends Section 7, there is a crucial factual distinction between these two cases and the instant case. In *Ingersoll-Rand* and *Allis-Chalmers*, there was no evidence of company policy against reciprocal dealing; in the instant case there is evidence to that effect which the Court regards as substantial, credible and persuasive. Such evidence is significant in the light of United States v. Penick & Ford, Ltd., 242 F.Supp. 518 (D.N.J. 1965), and United States v. Northwest Industries, Inc., 301 F.Supp. 1066 (N.D. Ill. 1969).

In *Penick & Ford*, the government sought to enjoin the acquisition of Penick & Ford, the fourth largest seller of starch, by Reynolds Tobacco Co. The government argued that, since Reynolds was a major buyer of paper and Penick & Ford sold starch to paper companies, there was a probability of reciprocity as a result of the merger, particularly in view of evidence that reciprocity had been and was a common practice in the starch industry. Reynolds, however, submitted affidavits that there was a company policy against reciprocal dealing. The government did not offer evidence to the contrary. The court refused to enjoin the acquisition on the ground, among others, that there had not been a sufficient showing that Reynolds would engage in reciprocal dealing. 242 F.Supp. at 525–6.

In *Northwest Industries*, the government sought to enjoin the acquisition of B. F. Goodrich Company, a diversified manufacturer, by Northwest Industries, one of the nation's largest industrial corporations. The government contended that, since the acquisition of Goodrich by Northwest would increase Northwest's volume of purchases, it was probable that the merger would result in reciprocal dealing. In addition, the government's evidence showed that subsidiaries of Northwest, as well as customers and suppliers of Goodrich and Northwest, had been and were engaged in reciprocal dealing. Northwest introduced evidence that it had a policy against reciprocal dealing, considered reciprocal buying practices uneconomical and had no machinery for effectuating such practices. The court found that "while it is clear that the potential for reciprocity would be substantially increased, the extent to which actual reciprocity would be practiced . . . is, on the basis of the present record, difficult if not impossible to forecast." 301 F.Supp. at 1095. Accordingly, the court refused to enjoin the merger on the ground, in part, that it had been "unable to find that the government has demonstrated probable success . . . with respect to the anti-competitive effect of the increased potential for reciprocity inherent in a combined Northwest-Goodrich." 301 F.Supp. at 1097.

Defendants' position in the instant case, if anything, is somewhat stronger than that of the defendants in *Penick & Ford* and *Northwest Industries*. Here, unlike *Penick & Ford* and *Northwest Industries*, the government has not established the existence of an organized reciprocity program or a prior history of

reciprocal dealing by defendants or their suppliers.

The legal basis for the government's claim with respect to reciprocal dealing rests on the contention that the mere showing that a merger will create a market structure conducive to reciprocal dealing, even in the teeth of substantial evidence which convinces the Court that defendants will not engage in reciprocal dealing, is sufficient to halt a merger under Section 7. Even if the Court were to reach the legal basis for the government's reciprocal dealing claim in the instant case, it is doubtful at best, upon the present state of the decisional law, that the government has demonstrated a reasonable probability of success at final hearing on this claim.

■ Since the government has not established either a factual basis or a legal basis for its claim that the proposed ITT-Grinnell merger will substantially lessen competition by creating a market structure conducive to reciprocal dealing, the Court concludes, as to this claim, that the government has not sustained its burden of establishing a reasonable probability of success on the merits upon final hearing.

## II

### ITT-HARTFORD MERGER

The government seeks a preliminary injunction to enjoin the proposed ITT-Hartford merger, as well at the proposed ITT-Grinnell merger, on the ground that it violates Section 7.

As indicated earlier,[47] a preliminary injunction will not issue unless the government has demonstrated a reasonable probability of success in proving a Section 7 violation at trial. It is necessary in the case of the ITT-Hartford merger, as in the case of the ITT-Grinnell merger, to measure against the probability of success standard each of the specific claims upon which the government relies in asserting that the proposed merger will substantially lessen competition.

With regard to the proposed ITT-Hartford merger, the government makes the following specific claims:

(1) That the proposed merger raises the probability of reciprocal dealing by creating a market structure conducive to such dealing.

(2) That the proposed merger will confer a competitive advantage in giving ITT's subsidiaries access to Hartford's surplus funds to use in financing expansion plans.

(3) That the proposed merger has vertical integration aspects.

(4) That the proposed merger has horizontal aspects in that it will eliminate actual and potential competition between ITT and Hartford.

(5) That, as a result of the proposed ITT-Hartford and ITT-Grinnell mergers, Grinnell's affiliation with Hartford will confer a competitive advantage.

Each of these specific claims will now be considered and in the order set forth above.

### (1) Claim of Reciprocal Dealing

The government's primary claim regarding the proposed ITT-Hartford merger is that it will substantially lessen competition by creating a market structure conducive to reciprocal dealing, leading to reciprocal purchasing arrangements. The government asserts that as a result of the proposed merger ITT will be able to exert pressure on its suppliers to switch their insurance business to Hartford by conditioning ITT's purchases of supplies on the suppliers' agreement to purchase insurance from Hartford. The government also asserts that, even if there were no pressure from ITT, its suppliers nevertheless will tend to switch their insurance business to Hartford in order to curry favor with ITT.

The first question is whether the government has established an adequate factual basis to support its claim with respect to reciprocal dealing, which rests

47. *Supra*, p. 774.

on the theory that the proposed merger will create a market structure conducive to such dealing.

Underlying this theory is the contention that ITT suppliers are significant actual or potential purchasers of insurance of the type Hartford sells. The government's basic position is that they are significant insurance purchasers; and it asserts that, since they are significant purchasers, the proposed merger creates an opportunity for reciprocal dealing because ITT suppliers might transfer their insurance business from their present insurers to Hartford.

In support of this position, the government has submitted statistical data showing that ITT suppliers represent a substantial percentage of insurance markets, ranging from 6½% in the case of property and liability insurance to 19% in the case of group health, life and accident insurance written for employers and sold to employees as group insurance.[48] Evidence introduced by defendants on the other hand casts doubt on the accuracy of such data.

The proposed merger obviously will not create an opportunity for reciprocal dealing unless ITT suppliers are significant actual or potential customers for insurance of the type Hartford sells. But even if they do represent a substantial insurance market, it does not necessarily follow that the proposed merger will create such an opportunity. As indicated in connection with the ITT-Grinnell merger,[49] there are several factors relevant to a determination of whether a merger will create an opportunity for reciprocal dealing. The extent to which ITT suppliers are purchasers of insurance of the kind sold by Hartford is but one of those factors. As the government witness, Dr. Mueller, stated, there are various "essential elements" necessary to the existence of such opportunity for reciprocal dealing.[50]

The evidence in the instant case regarding certain critical factors relevant to a determination of whether the proposed merger will result in the creation of a market structure conducive to reciprocity is conflicting; it raises genuine and substantial issues of fact. For example, there was evidence concerning the characteristics of the product which supposedly will be the subject of reciprocal purchasing arrangements. Dr. Mueller, an economist, testified that before reciprocity considerations will affect purchasing decisions, "[t]he product involved must be either interchangeable with the product sold by its competitor — in other words, be, in the economist's term, more or less homogeneous—or when it is differentiated, then these differences can be translated into price and cost differences."[51] If there are significant differences between the insurance coverage offered by Hartford and its competitors, ITT suppliers presumably would be reluctant, and would find it difficult, to transfer their insurance business to Hartford.

The government contends that insurance is the type of product that lends itself to reciprocal buying arrangements. In support of this contention, the government points to evidence that insurance coverage is essentially interchangeable and that any number of insurers are equally acceptable to an insured.[52] The government also relies on evidence that large companies can and do readily transfer their insurance business from one insurer to another.[53]

Defendants on the other hand have adduced substantial evidence to the contrary. Their evidence establishes that insurance varies widely with respect to cost, service and coverage, as well as in

48. GX 3, ¶¶ 28, 29.

49. *Supra*, p. 782.

50. Mueller, Tr. 13.

51. *Id.*

52. LaCroix, Tr. 86-7; Dannenberg, Tr. 108-110.

53. LaCroix, Tr. 86; Dannenberg, Tr. 113-14; GX 124; GX 132.

other respects.[54] Defendants introduced uncontroverted evidence that large corporations frequently employ insurance managers and brokers to make insurance purchasing decisions and to secure the best insurance coverage available for the particular needs of the company.[55] Defendants point to the existence of insurance managers and brokers as indicative that insurance purchasing decisions are complicated decisions which do not lend themselves to reciprocity considerations.

Defendants' evidence also indicates that in Hartford's field of insurance the relationship between insured and insurer tends to be long-term and that there is little if any motive for an insured to switch from one insurer to another.[56] The evidence shows that it is advisable for an insured to continue a satisfactory relationship with an insurer rather than to transfer its insurance business to another insurer for several reasons.[57] One reason is that if a company acquires a reputation for switching carriers, it soon finds that insurers are reluctant to insure it because insurers are unwilling to incur the substantial startup costs involved in initiating a large scale insurance program unless there is a reasonable expectation that they will be able to keep the coverage for a substantial period.[58] Another reason is that if an insured company has a long-term relationship with an insurer, the insured can build up a surplus on its account during periods when there are a minimal number of costly claims.[59] Such a surplus can be of benefit to the insured by making an insurer more tolerant of periods in which the account is unprofitable due to costly claims and in obtaining lower premium rates when the insurance contract is renegotiated.

■ A careful evaluation of all of the evidence on this issue leaves the Court with the definite belief that, on balance, there is at least as much evidence, qualitatively as well as quantitatively, indicating that insurance does not lend itself to reciprocal purchasing, as there is evidence to the contrary. The evidence of the government and defendants consists of affidavits and live testimony. The government's affidavits are entitled to no more weight than those of defendants. General Electric Co. v. American Wholesale Co., 235 F.2d 606, 608–09 (7 Cir. 1956); Warner Bros. Pictures, Inc. v. Gittone, 110 F.2d 292, 293 (3 Cir. 1940); Hershey Creamery Co. v. Hershey Chocolate Corp., 269 F.Supp. 45, 58 (S.D.N.Y. 1967). Nor is there any basis in the record upon which the Court would be warranted in concluding that the testimony concerning the characteristics of insurance and insurance purchasing of the government's witnesses, Mr. LaCroix and Mr. Dannenberg, an executive officer of one of Hartford's competitors, and an economist, respectively, should be given any greater weight than that of defendants' witnesses, Mr. Johnson and Mr. Harrington, an executive officer of another of Hartford's competitors, and an insurance broker, respectively. Thus, the evidentiary record on the instant preliminary injunction motion does not establish that insurance is the type of product which lends itself to reciprocal dealing or that insurance purchasing decisions are the type of purchasing decisions likely to be influenced by reciprocity considerations. Rather, the record indicates just the opposite.

■ While the evidence with respect to the characteristics of insurance and insurance purchasing decisions at best is conflicting and raises genuine and sub-

---

54. Harrington, Tr. 195–8; Johnson, Tr. 325–8; DX 26, ¶ 6; DX 28, ¶ 6.

55. Harrington, Tr. 191–2; DX 20, ¶¶ 1, 2; DX 24, ¶ 1; DX 26, ¶ 6.

56. Johnson, Tr. 306–7; Harrington, Tr. 202–3; DX 11, ¶ 2; DX 22, ¶ 4; DX 27, ¶ 5; DX 24, ¶ 2(c), ¶ 3.

57. Johnson, Tr. 306–7; Harrington, Tr. 202–3; DX 22, ¶ 4; DX 27, ¶ 5.

58. DX 22, ¶ 4; DX 27, ¶ 5.

59. Johnson, Tr. 306–7; Harrington, Tr. 202–3; DX 11, ¶ 2; DX 22, ¶ 4; DX 24, ¶ 3.

stantial issues of fact, there are other relevant factors with respect to which the evidence is slight and inconclusive. One such factor is the degree to which the markets within which the suppliers of the acquiring company operate are competitively structured. This is a relevant factor because, if the market within which a supplier operates is competitively structured, a buyer cannot readily exert pressure on the supplier to engage in reciprocal practices since the supplier can replace the buyer by selling to other buyers at the same or a slightly lower price. Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L.Rev. 1313, 1388 (1965); Brodley, Oligopoly Power Under the Sherman And Clayton Acts, 19 Stan.L.Rev. 285, 327 (1967). The record on this point is largely silent. It can not be determined, therefore, whether ITT suppliers operate within an oligopolistic or concentrated market with dull price competition. And yet this is one of the elements essential to create an opportunity for reciprocal dealing.

In short, whether the proposed ITT-Hartford merger will result in the creation of a market structure conducive to reciprocal dealing involves complex factual issues. The evidentiary record at this stage of the proceedings with regard to some of the critical factors relevant to a determination of whether the merger will create an opportunity for reciprocal dealing at best is conflicting; as to certain relevant factors, the record on balance tends to support defendants' position rather than the government's position; and as to other relevant factors, the record is too slight and inconclusive to permit any findings to be made. The Court holds that the government has not clearly established the extent to which the proposed merger will create a market structure conducive to reciprocal dealing.

Even assuming *arguendo* that the proposed merger would result in a market structure conducive to reciprocal dealing, it does not necessarily follow that such dealing will occur, as the government urges. Much of the government's evidence in support of its position on this issue consists of affidavits from individuals in the industry—primarily insurance agents—containing speculative and conclusory statements that reciprocal dealing will occur if the merger creates the opportunity for such dealing.[60] Such affidavits are entitled to little weight. See Hart v. Yellowley, 284 Fed. 245, 247–49 (2 Cir. 1922); Model Etts Corp. v. Merck & Co., 118 F.Supp. 259, 261 (S.D.N.Y. 1953).

The government has introduced evidence purporting to show that reciprocity is practiced in the insurance industry;[61] but only a few specific instances of reciprocal dealing are identified in the government evidence,[62] and none involves Hartford in any way. Defendants have adduced substantial evidence to the contrary.[63]

The remainder of the government's evidence purports to show that ITT has a policy of reciprocal dealing for the purpose of expanding its own sales and those of its subsidiaries. This evidence consists of a few documents relating to the ITT-Avis merger which the government claims demonstrate that possible reciprocal dealing advantages were a consideration in that merger.[64] These documents, however, do not clearly indicate that reciprocity was a consideration; and the government's interpretation of them is questionable in light of the testimony before the Court in the instant case by Mr. Geneen, the president of ITT, that the possibility of reciprocal dealing was not one of ITT's motives for merging with Avis and that ITT has never approached any suppliers on behalf of

60. GX 5, ¶ 9; GX 6, ¶ 6; GX 7, ¶ 5; GX 129, ¶ 7.

61. LaCroix, Tr. 84, 90–91; Dannenberg, Tr. 117; GX 127, p. 2.

62. LaCroix, Tr. 90–91; Dannenberg, Tr. 117, 127.

63. Johnson, Tr. 296–97.

64. GX 77; GX 78.

Avis.[65] Moreover, Mr. Geneen testified that the opportunity for diversification, not the possibility of reciprocal dealing advantages, was ITT's motive for the proposed merger with Hartford.[66]

Furthermore, defendants' evidence indicates that ITT has a long, well established anti-reciprocity policy based on a business judgment that reciprocity is uneconomical in the long run.[67] Defendants also have introduced evidence that ITT is organized in a way which inhibits the practice of reciprocity and that it has no machinery to effectuate the practice. Such evidence (substantially the same as referred to above in connection with the ITT-Grinnell merger[68]) shows that ITT is organized on a "profit center" basis, with each division and subsidiary having its own separate decentralized purchasing and sales department; recognition and compensation of the management of each profit center depends on that profit center's own performance rather than on the performance of ITT as a whole. Consequently, defendants assert, the management of each profit center would have no incentive to enter into reciprocal purchasing arrangements, since they would benefit another profit center rather than the profit center which would enter into such arrangements.[69] There also is evidence that ITT implements its policy against reciprocal dealing by withholding purchasing data from sales personnel and vice versa; and such data would appear to be necessary to practice reciprocity.[70]

Finally, defendants have adduced considerable evidence that ITT's major suppliers have anti-reciprocity policies and in fact do not practice reciprocity in the purchase of insurance.[71] Defendants point out that, even if ITT suppliers on their own initiative were to transfer their insurance business to Hartford to curry favor with ITT, they would find that this simply would not have the desired effect because of ITT's policy of withholding sales data from its purchasing personnel; under such circumstances, suppliers would discontinue any efforts to curry favor with ITT by buying Hartford insurance.[72]

The government's factual claim with respect to reciprocity really boils down to this: that the proposed merger will create an opportunity for reciprocal dealing, from which the government infers that such dealing will occur. Aside from the absence of clear evidence that the proposed merger will create a market structure conducive to reciprocal dealing, the Court is not able to make a finding based on the government's suggested inference in the teeth of the very substantial, credible evidence to the contrary.

Accordingly, since the record at this stage of the proceedings does not establish either the extent to which the proposed merger will create a market structure conducive to reciprocal dealing or the extent to which reciprocal dealing will occur if the merger were to create an opportunity for such dealing, the Court holds that the government has not demonstrated a reasonable probability of success in establishing the factual basis for its claim with respect to reciprocal dealing.

Even if the government had established a factual basis for its claim with respect to reciprocal dealing, it still would be required to demonstrate a reasonable probability of success in establishing the legal basis for such claim. As with the ITT-Grinnell merger, the legal basis for the reciprocal dealing claim here rests on the government's theory that, once it

65. Geneen, Tr. 382–4.

66. Geneen, Tr. 344.

67. Geneen, Tr. 365–70.

68. *Supra*, pp. 782–783.

69. Geneen, Tr. 360–4, 373–6.

70. Geneen, Tr. 372–3.

71. Harrington, Tr. 206; DX 20, ¶ 14; DX 21, ¶ 7; DX 22, ¶ 8; DX 23, ¶ 5; DX 24, ¶¶ 2, 4; DX 25, ¶ 6; DX 26, ¶ 4; DX 27, ¶¶ 3, 6; DX 28, ¶ 2; DX 29, ¶ 3; DX 32, ¶ 4.

72. Geneen, Tr. 385–6.

has shown a merger will create an opportunity for reciprocal dealing, that is sufficient to halt the merger under Section 7. While there are decisions to that effect, there are other persuasive decisions which indicate that such a showing is not sufficient in the face of specific evidence that the merging companies will not avail themselves of opportunities for reciprocal dealing created by the merger.[73] Here there is specific evidence to that effect. Hence, even if the Court were to reach the legal basis for the government's reciprocal dealing claim, it is doubtful at best whether the government could demonstrate a reasonable probability of success in establishing the legal basis for such claim so as to halt the merger under Section 7 at this stage of the proceedings.

Since the government has not established either a factual basis or a legal basis for its claim that the proposed ITT-Hartford merger will substantially lessen competition by creating a market structure conducive to reciprocal dealing, the Court concludes that, as to this claim, the government has not sustained its burden of establishing a reasonable probability of success on the merits upon final hearing.

(2) *Claim of Access to Hartford's Financial Resources*

Although the government's primary claim regarding the proposed ITT-Hartford merger is that it will substantially lessen competition by creating a market structure conducive to reciprocal dealing, another major claim is that the proposed merger will give ITT subsidiaries access to Hartford's financial resources for use in financing ITT's expansion plans, a competitive advantage which may result in substantial lessening of competition within the meaning of Section 7.

The government makes specific allegations with respect to the use of Hartford's financial resources by several ITT subsidiaries. Its allegations in this regard as to the ITT subsidiary, Levitt & Sons, Inc., a home builder, are representative; and they are the only allegations in support of which enough specific evidence has been adduced to permit a determination of whether the probability of success standard has been met.[74]

■ The legal basis for the government's claim rests on the decisions, previously discussed,[75] which indicate that if a company that is dominant in a relatively oligopolostic market merges with another company as a result of which the former gains marketing and promotional competitive advantages, the merger violates Section 7. FTC v. Procter & Gamble Co., 386 U.S. 568, 578–80 (1967); General Foods Corp. v. FTC, 386 F.2d 936, 945–46 (3 Cir. 1967), cert. denied, 391 U.S. 919 (1968); United States v. Ingersoll-Rand Co., 320 F.2d 509, 524 (3 Cir. 1963); United States v. Wilson Sporting Goods Co., 288 F. Supp. 542, 556–58 (N.D.Ill.1968). The particular competitive advantage alleged here, access to financial resources, is similar or analogous to the competitive advantages involved in the cases cited above. See, e. g., *Ingersoll-Rand, supra,* at 524. Thus, existing precedent supports the legal basis for the government's claim.

There remains to be considered the factual basis for the government's claim. With respect to Levitt, there are essentially two questions. First, is Levitt the dominant competitor in a relatively concentrated industry? Second, will Levitt. derive a competitive advantage through access to Hartford's financial resources which it would not otherwise have?

---

73. *Supra,* pp. 783–786.

74. The government also alleges that Hartford's financial resources will be used to finance the expansion plans of Avis, Inc., Sheraton Corporation of America, Airport Parking Company of America, Inc., Continental Baking Company and the Canteen Corporation, all of which are ITT subsidiaries; but there is insufficient evidence to permit a finding on this issue as to these subsidiaries.

75. *Supra,* pp. 775–776.

The government asserts that Levitt is the leading home builder in the United States;[76] but it has made no showing that Levitt is the dominant competitor in this industry and that the industry is relatively concentrated. Thus, the record at this stage of the proceeding does not permit a finding as to whether Levitt is the dominant competitor in the home building industry.

Even assuming that Levitt were the dominant competitor in this industry, there is a substantial dispute between the government and defendants concerning the government's claim that Levitt will gain a competitive advantage through access to Hartford's surplus. The government's evidence shows that Hartford has approximately $400 million in surplus over the surplus required by law to be maintained to cover current insurance business (i. e. "surplus surplus"); and defendants do not challenge this fact.[77] The chief dispute is over whether Levitt will be permitted to use the Hartford surplus to finance its expansion plans. The principal evidence introduced by the government in support of its claim that Levitt will utilize Hartford's surplus is an unsigned report prepared by an ITT employee concerning the possible advantages of an ITT-Hartford merger.[78] One advantage referred to in this report is the opportunity to use Hartford funds to finance Levitt's land and housing development programs. Mr. Geneen, however, testified that this report did not and does not represent ITT's intention with regard to Hartford's surplus; he testified unequivocally that ITT does not intend at any time to remove Hartford's surplus and that ITT has made a commitment to that effect to Hartford;[79] and he specifically denied any intention on the part of ITT to divert any portion of Hartford's surplus to Levitt.[80]

Moreover, there was considerable testimony that the removal of Hartford's surplus would have an adverse effect on its insurance operations by restricting the amount and kind of risks it would be able to underwrite; that ITT is fully capable of raising all the capital it needs from outside sources, as also is Levitt without assistance from ITT; and that it is more economical and efficient for ITT to raise capital through conventional financing methods than by acquiring Hartford with its excess surplus.[81] The government did not controvert this testimony. Defendants point out that, in view of the adverse effect that ITT's removal of the surplus would have on Hartford's insurance operations, ITT would not be inclined to do so; that, since ITT and Levitt are fully capable of obtaining their capital needs through conventional financing methods, ITT would have no incentive to merge with Hartford for this reason; and that ITT, and subsidiaries such as Levitt, would not gain a competitive advantage as a result of the merger through access to Hartford's surplus, since all the funds they need are available to them absent the merger. Cf. *Wilson Sporting Goods, supra*, at 553.

In short, whatever may be the possibilities that ITT subsidiaries such as Levitt may gain a competitive advantage as a result of the proposed merger through access to Hartford's surplus, the evidentiary record at this stage of the proceedings does not permit a finding that the government has established a reasonable probability of success on the merits as to this claim upon final hearing. The Court so holds.

### (3) *Claim of Vertical Integration*

A further claim of the government is that the ITT-Hartford merger will have some of the characteristics of a vertical merger with anti-competitive effects which will violate Section 7. As

---

76. GX 3, ¶ 7. Defendants do not challenge this assertion. Friedman, Tr. 137.

77. GX 47, p. 1.

78. GX 54.

79. Geneen, Tr. 347–8.

80. *Id.* See Schoen, Tr. 267–8; GX 47, p. 1.

81. Friedman, Tr. 132–8; GX 47, p. 2.

defined earlier,[82] a vertical merger is an acquisition in which the acquired company sells products bought by the acquiring company or buys products sold by the acquiring company.

In the instant case the government contends that the proposed merger has vertical integration aspects in that ITT and its subsidiaries are substantial purchasers of insurance of the type sold by Hartford, and that Hartford's competitors will be foreclosed as a result of the proposed merger. The government argues that there is a likelihood that ITT and its subsidiaries will transfer their insurance business to Hartford and thus foreclose Hartford's competitors from the ITT insurance market, resulting in a substantial lessening of competition within the meaning of Section 7.

Although the government asserts that the merger also has other vertical characteristics, the argument just mentioned is its strongest argument and the one on which there is the most evidence.[83]

The legal basis for the government's claim is not open to question. In the leading case of Brown Shoe Co. v. United States, 370 U.S. 294 (1962), the Supreme Court analyzed vertical mergers in the context of Section 7 and held that a merger between Brown, a leading shoe manufacturer and retailer, and Kinney, a shoe manufacturer and retailer, violated Section 7 on the ground, among others, that it had vertical integration aspects which were anti-competitive.

The factual basis for the government's claim in the instant case, i. e. the application of the facts here to the principles enunciated in *Brown Shoe*, poses certain problems.

A merger which is wholly or partially vertical does not constitute a per se violation of Section 7. The statute proscribes a merger which may substantially lessen competition "in any line of commerce in any section of the country." 15 U.S.C. § 18. Consequently, a merger will violate Section 7 because of its vertical integration aspects only if the effects of those aspects run afoul of the statutory standard.

The first step in determining whether the vertical aspects of a merger offend Section 7 is to define the relevant "line of commerce" and "section of the country". This requires defining the relevant product market and geographic market. *Brown Shoe, supra,* at 324–28. While the government's evidence does not define the relevant product market fully and precisely in accordance with the criteria set forth in *Brown Shoe,* defendants do not interpose serious objections to the government's asserted definitions. Accordingly, they are accepted for the purpose of the instant preliminary injunction motion. The government refers to the insurance market and apparently considers property and liability insurance, life, accident and health insurance, and workmen's compensation insurance, as relevant product submarkets. The relevant geographic market is the national market.

Having accepted such relevant product and geographic markets, the next step is to determine whether the effect of the prospective vertical integration *may be substantially to lessen competition* within those markets. If the size of the market share foreclosed to competition as the result of the vertical integration aspects of a merger is "de minimis", there is no Section 7 violation

---

82. *Supra,* p. 774.

83. Other vertical integration aspects of the proposed merger, according to the government, are: (1) groups associated with ITT and its subsidiaries, such as ITT shareholders and Sheraton and Avis credit card holders, are purchasers of insurance of the type sold by Hartford, and as a result of the proposed merger Hart-

ford will be able to obtain lists of these groups which can be used in the solicitation of insurance; and (2) Hamilton Management Corporation, an ITT subsidary, which sells a life and mutual fund program, will be used as a distributional outlet for Hartford fire and casualty insurance.

because in such a situation competition can not be said to have been substantially lessened. *Brown Shoe, supra,* at 329.

The statistical data introduced by the government in support of its position that the foreclosure will not be de minimis consists of figures showing the total dollar value of insurance premiums which ITT and its subsidiaries paid to domestic insurers in a given year. Defendants' statistical data, on the other hand, consists of figures showing the percentage of the total dollar value of all premiums paid to domestic carriers which these premiums represent. The figures for property and liability insurance are representative. While the government's evidence shows that ITT paid $10.8 million in property and liability insurance premiums in a given year,[84] defendants adduced uncontroverted evidence that this figure represented approximately $\frac{1}{25}$ of 1% of the total property and liability insurance premiums paid to domestic insurers during this period.[85] Such figures, showing such small percentages of premiums involved, seem to indicate that the size of the prospective market share supposedly to be foreclosed to competition is indeed of de minimis proportions and preclude a finding to the contrary.

Moreover, defendants assert that the actual foreclosure would be even smaller than these figures indicate. They point out that it is unlikely that Hartford either could, or would be willing to, underwrite all of the property and liability insurance of ITT and its subsidiaries. Defendants have adduced evidence that substantial proportions of ITT's property insurance coverage is of the type which only insurance pools can underwrite. And there is evidence that Hartford in the past has declined to submit a bid for property insurance coverage of Avis, an ITT subsidiary engaged in the car rental business, because of Hartford's belief that it could not profitably underwrite such coverage.[86]

The government argues that, even if the vertical integration effects of the proposed merger do not result in a foreclosure of competition substantial enough to violate Section 7, the foreclosure resulting from the vertical integration effects, combined with the foreclosure resulting from the reciprocal dealing made possible by the merger, establish a Section 7 violation. There is authority which lends some support to this argument. See United States v. Wilson Sporting Goods Co., 288 F.Supp. 543, 563 (N.D.Ill.1968). There also is authority which suggests the contrary. See United States v. Northwest Industries, Inc., 301 F.Supp. 1066, 1097 (N.D. Ill.1969). Whether the alleged anticompetitive effects of a merger may be aggregated in determining whether the merger violates Section 7, is an unresolved question.

 Even assuming that the size of the share of relevant insurance markets to be foreclosed to Hartford's competitors as a result of the vertical integration aspects of the proposed merger were not of de minimis proportions, it does not necessarily follow that these aspects constitute a Section 7 violation. If the foreclosure is not de minimis, the size of the share of the market foreclosed is "an important consideration" but "cannot itself be decisive" in determining whether the merger violates Section 7 because of its vertical integration aspects. *Brown Shoe, supra,* at 328–9; United States v. Atlantic Richfield Company, 297 F.Supp. 1061, 1071 (S.D.N.Y.1969). Other important factors are the trend toward concentration in the industry, *Brown Shoe, supra,* at 332; United States v. Von's Grocery Co., 384 U.S. 270, 277–78 (1966); the degree of concentration in the industry, *Brown Shoe, supra,* at 322; United States v. Philadelphia Nat. Bank, 374 U.S. 321, 365 n. 42 (1963); and the nature and purpose of the vertical arrangement, *Brown Shoe, supra,* at 329.

84. GX 3, ¶ 19.

85. DX 1, ¶ 4.

86. Harrington, Tr. 198–9, 229–30; Schoen, Tr. 266–7; Johnson, Tr. 298–9; DX 19, ¶ 2.

The evidentiary record on the instant preliminary injunction motion is conflicting and raises substantial issues of fact concerning the extent to which there is a trend toward concentration in the insurance industry, the degree of concentration in the industry and the nature and purpose of the prospective vertical arrangement. In short, the record at this stage of the proceedings does not permit a finding that the government has established a reasonable probability of success on the merits upon final hearing with respect to its claim that the proposed merger is proscribed by Section 7 because of its vertical integration aspects.

(4) *Claim of Elimination of Actual and Potential Horizontal Competition*

Still another claim of the government is that the proposed ITT-Hartford merger will eliminate actual and potential horizontal competition between them, resulting in a substantial lessening of competition in violation of Section 7.

When one company acquires another company producing the same or a similar product and selling it in the same geographic market, it is commonly termed a horizontal merger. If such a merger will have the effect of substantially lessening competition within the relevant market, it violates Section 7. United States v. Brown Shoe Co., 370 U.S. 294, 345–46, 339–45 (1962).

The factual basis for the government's claim that the proposed merger has horizontal aspects violative of Section 7 is that several ITT subsidiaries and Hartford write life insurance. Defendants point out, however, that the combined market position of ITT and Hartford is less than 3/10 of 1%, and the government has adduced no evidence to the contrary.[87] The asserted foreclosure of competition as a result of the horizontal aspects of the proposed merger clearly is de minimis.

87. DX 1, ¶¶ 10, 12.

A merger which has the effect of eliminating one of the parties to a merger as a potential competitor of the other, as well as a merger which has the effect of eliminating actual competition between the companies, may offend Section 7. FTC v. Procter & Gamble Co., 386 U.S. 568, 580–81 (1967); United States v. Penn-Olin Chemical Co., 378 U.S. 158, 172–77 (1964); United States v. El Paso Natural Gas Co., 376 U.S. 651, 657–62 (1964). Whether the loss of potential competition is sufficient to constitute a Section 7 violation depends on several factors such as the rate of growth and competitive structure of the relevant market, the potential entrant's interest in and capability of entering, and the number of other potential entrants. *Procter & Gamble, supra,* at 580–81; *Penn-Olin, supra,* at 176–77; *El Paso, supra,* at 660.

The government's factual basis for its claim that the proposed merger will eliminate potential competition between ITT and Hartford is primarily that Hartford is a potential competitor of ITT in various fields by virtue of its excess surplus of approximately $400 million which could be used to expand into other areas and that it had an active acquisition program in 1968 which came to a halt when it agreed to merge with ITT.[88] The government, however, has introduced no evidence regarding the various factors relevant to a determination of whether a merger constitutes a violation of Section 7 because it eliminates potential competition.

Upon this state of the record, therefore, there is no basis upon which the Court would be warranted in finding that the government has established a reasonable probability of success on the merits upon final hearing with respect to its claim that the proposed merger will eliminate actual and potential horizontal competition.

88. GX 46, p. 22; GX 80.

(5) *Claim of Competitive Advantage to Hartford from Grinnell's Affiliation with Hartford*

Finally, the government claims that the proposed ITT-Hartford merger violates Section 7 on the ground that Grinnell will gain a competitive advantage through affiliation with Hartford as a result of the merger. This claim has been discussed in connection with the ITT-Grinnell merger.[89] The Court holds, as the record now stands, that the government has not demonstrated a reasonable probability of success with respect to this claim.

## CLAIM OF ECONOMIC CONCENTRATION

In the *Hartford* case, and to a lesser extent in the *Grinnell* case, the government has introduced evidence that in the last two decades there has been an increasing concentration of economic power in the hands of fewer and larger corporate entities. This has been the result in part of extensive merger activity, including conglomerate mergers in recent years. ITT has become the eleventh largest industrial corporation in the United States on the basis of sales, due in part to a series of acquisitions, some conglomerate in nature. The proposed Grinnell and Hartford acquisitions are the most recent of ITT's conglomerate activities. Hartford is a leading property and liability insurance company on the basis of premium receipts and assets. And there has been a recent trend toward mergers and a concomitant increase in concentration in the insurance industry.[90]

While the legislative history of Section 7 of the Clayton Act, as amended in 1950, 64 Stat. 1125, reflects a concern on the part of Congress about the rising tide of economic concentration in American industry caused by all types of mergers, including conglomerate mergers,[91] amended Section 7 as enacted proscribes only those mergers the effect of which "may be substantially to lessen competition", not those mergers the effect of which may be substantially to increase economic concentration.

In some contexts, of course, evidence of economic concentration and a merger trend is important in determining whether a merger violates Section 7. For example, as indicated above,[92] the trend toward concentration and the degree of concentration in the insurance industry would be relevant factors in determining whether the alleged vertical integration aspects of the IT.'-Hartford merger violate Section 7.

A merger which has the effect of increasing economic concentration, even substantially, however, does not necessarily lessen competition substantially; and evidence that a merger may increase economic concentration, without more, is not sufficient to halt a merger under Section 7 without a specific showing that it may have anti-competitive effects. United States v. Northwest Industries, Inc., 301 F.Supp. 1066, 1096 (N.D.Ill.1969).

The alleged adverse effects of economic concentration brought about by merger activity, especially merger activity of large diversified corporations such as ITT, arguably may be such that, as a matter of social and economic policy, the standard by which the legality of a merger should be measured under the antitrust laws is the degree to which it may increase economic concentration— not merely the degree to which it may lessen competition. If the standard is to be changed, however, in the opinion of this Court it is fundamental under our system of government that that deter-

---

89. *Supra*, pp. 778–780.

90. GX 3, ¶¶ 5–6, 8–12, 32, 34, 38; GX 38, pp. 68–81; GX 40; GX 46, p. 30; GX 47. (*ITT-Hartford* case)

91. Brown Shoe Co. v. United States, 370 U.S. 294, 315–18 (1962).

92. *Supra*, p. 794.

mination be made by the Congress and not by the courts.[93]

## COURT'S EQUITABLE JURIS-DICTION: FORM OF ORDER TO BE ENTERED

■ The Court having concluded, after careful consideration of each of the government's claims and the entire evidentiary record presently before the Court, that the government has not sustained its burden of establishing at this stage of the proceedings a reasonable probability of success in proving at trial that either the ITT-Grinnell merger or the ITT-Hartford merger will result in substantial anti-competitive effects, the government's motions for preliminary injunctions in each case must be denied.

■ Having reached this conclusion on the probability of success issue,[94] the Court is not required to reach the balancing of the equities issue which otherwise would have to be resolved before determining whether preliminary injunctions should be granted or denied.[95]

■ The Court has decided, however, in the exercise of its inherent equitable powers and pursuant to what it believes to be sound administration of federal justice, to condition the denial of preliminary injunctions upon the entry of appropriate hold separate orders to preserve the status quo pending the hearing and decision of the cases on their merits.[96]

93. There has been some difference of opinion on the part of the Antitrust Division of the Department of Justice as to whether this determination should be made by the Congress or by the courts. *Compare* Turner, Conglomerate Mergers and Section 7 of the Clayton Act, 78 Harv.L. Rev. 1313, 1393–95 (1965), *with* McLaren, Statement Before House Ways and Means Committee, March 12, 1969. The present Assistant Attorney General in charge of the Antitrust Division, with commendable candor, has noted this conflict (*McLaren, supra*, at 7–8):

"My predecessors at the Antitrust Division took the position that 'purer' forms of conglomerate mergers could not be reached under Section 7 because, in their view, where merging firms are commercially unrelated, proof cannot generally be made of a reasonable likelihood of a substantial lessening of competition as called for by the Act's provisions. They suggested that conglomerate mergers which threaten undue concentration of economic power should be dealt with through new legislation.

At the Senate Judiciary hearing on my confirmation in January, I stated that I was not persuaded that Section 7 will not reach purer types of conglomerate mergers than have been dealt with by the courts thus far.

\* \* \* \* \* \*

I have also stated that I am by no means opposed to amendatory legislation, but I feel that the matter is too pressing to wait, and we are willing to risk losing some cases to find out how far Section 7 will take us in halting the current accelerated trend toward concentration by merger and—as I see it—the severe economic and social dislocations attendant thereon."

Government counsel on the instant preliminary injunction motions have demonstrated competence and diligence of the highest order in presenting the government's cases fully, fairly and at all times in keeping with the high professional standards of the Department of Justice.

94. Question (1) set forth at the beginning of this opinion. *Supra*, p. 769.

95. Question (2) set forth at the beginning of this opinion. *Supra*, p. 769.
Under Section 15 of the Clayton Act, which confers jurisdiction upon the district courts "at any time [to] make such temporary restraining order or prohibition as shall be deemed just in the premises", 15 U.S.C. § 25, balancing of the equities—in terms of injury to the public interest if an injunction were denied, as against injury to the defendants if it were granted—is a relevant factor, once the probability of success standard has been met, in deciding whether to deny or grant injunctive relief. United States v. Ingersoll-Rand Co., 320 F.2d 509, 525 (3 Cir. 1963); United States v. Atlantic Richfield Co., 297 F.Supp. 1061, 1073 (S.D.N.Y.1969); United States v. Chrysler Corp., 232 F.Supp. 651, 659 (D.N.J.1964); United States v. Brown Shoe Co., 1956 Trade Cases ¶ 68,244 (E.D.Mo.).

96. Question (3) set forth at the beginning of this opinion. *Supra*, p. 769.

Briefly stated, the chief reasons for entering hold separate orders here are: the willingness on the part of defendants that such orders be entered,[97] particularly in view of ITT's expressed intention that Grinnell and Hartford shall be operated as separate entities in any event; the possibility (as distinguished from the probability) that the government may succeed at trial in proving alleged anti-competitive effects of the proposed mergers in some line of commerce in some section of the country; the apparent unavailability of immediate appellate review of this Court's orders on the instant preliminary injunction motions;[98] and the Court's obligation insofar as possible to maintain the status quo pending trial and decision on the merits. Moreover, the Court is impressed with the soundness of the hold separate order entered by Judge Will in United States v. Northwest Industries, Inc., 301 F.Supp. 1066, 1097–1100 (N.D. Ill.1969).

Accordingly, counsel are directed to submit within one week from the date of this decision proposed orders to be entered herein, upon stipulation as to form if possible; if not, they will be settled upon 2 days notice. In addition to the usual provisions denying the motions for preliminary injunctions, the Court suggests that hold separate provisions along the following lines be included requiring ITT (and, to the extent appropriate, Grinnell and Hartford as well):

(1) to take all steps necessary to maintain Grinnell and Hartford as separate and viable companies, and to make no changes in their operations which might hinder divestiture;

(2) to preserve and protect all assets of Grinnell and Hartford, and to refrain from disposing of any of their assets except in the ordinary course of business without further order of the Court;

(3) to refrain from issuing any additional securities of Grinnell or Hartford and from incurring any additional indebtedness of Grinnell or Hartford other than in the ordinary course of business without further order of the Court;

(4) to retain separate and unencumbered all shares of Grinnell and Hartford which it may own or receive, subject to further order of the Court;

(5) to take all steps necessary to maintain the independent managements of Grinnell and Hartford, with no officer, employee, director or designee of ITT or its subsidiaries serving as an officer or director of Grinnell or Hartford except that three of the members of the Boards of Directors of Grinnell and Hartford may be officers or directors of ITT or any of ITT's other subsidiaries;

(6) to refrain from engaging in any reciprocal dealing on behalf of Grinnell or Hartford;

(7) to refrain from engaging in package or system selling of ITT and Grinnell products;

---

97. Geneen, Tr. 426–32.

98. The controlling statutes are: 28 U.S.C. § 1292(a)(1)(1964) and 15 U.S.C. § 29 (1964).
The First and Ninth Circuits, and Mr. Justice Goldberg in a ruling in Chambers, have concluded that an appeal does not lie from an interlocutory order in a government antitrust suit brought under Section 7. United States v. Cities Service Co., 410 F.2d 662 (1 Cir. 1969); United States v. FMC Corp., 321 F.2d 534 (9 Cir. 1963), government petition for preliminary injunction pending cert. denied by Goldberg, J., 84 S.Ct. 4 (1963); cf. Brown Shoe Co. v. United States, 370 U.S. 294, 305 n. 9 (1962); United States v. California Cooperative Canneries, 279 U.S. 553, 558 (1929). Contra, United States v. Ingersoll-Rand Co., 320 F.2d 509, 511–17 (3 Cir. 1963).
During the hearing on the instant preliminary injunction motion in the Hartford case, government counsel stated that the present position of the Antitrust Division is that it would not seek to appeal an order of this Court denying injunctive relief (Coyle, Tr. 467).

(8) to refrain from using the position and influence of Hartford as an affiliate to assist Grinnell in securing sales;

(9) to refrain from removing Hartford's "surplus surplus";

(10) to refrain from transferring to Hartford the insurance coverage of ITT and its subsidiaries presently written by companies other than Hartford;

(11) to take such other action or refrain from such other action as the Court, after hearing, may find necessary to achieve maximum preservation of the status quo consistent with the efficient day-to-day operation of Grinnell and Hartford.

### CONCLUSIONS

Upon the facts found and for the reasons stated above, in the *Grinnell* case and in the *Hartford* case, the Court concludes as follows:

(1) That the Court has jurisdiction over the subject matter of, and the parties to, both actions.

(2) That the government has not sustained its burden of establishing a reasonable probability of success in proving at trial that either the ITT-Grinnell merger or the ITT-Hartford merger will result in substantial anti-competitive effects.

(3) That the government's motions for preliminary injunctions in both actions must be denied.

(4) That the Court, in the exercise of its inherent equitable powers and pursuant to what it believes to be sound administration of federal justice, will enter appropriate hold separate orders in both actions to preserve the status quo pending trial and decision on the merits.

The foregoing constitute the Court's findings of fact and conclusions of law pursuant to Rule 52(a), Fed.R.Civ.P.

---

### ORDER ON GOVERNMENT'S MOTION FOR PRELIMINARY INJUNCTION IN *GRINNELL* CASE

Plaintiff, United States of America, on August 1, 1969, having filed its complaint herein against defendants International Telephone and Telegraph Corporation (ITT) and Grinnell Corporation (Grinnell); plaintiff, on August 6, 1969, having filed a motion for a preliminary injunction; the Court, on September 17, 1969, having received evidence and heard arguments by counsel for the respective parties; the Court, on October 21, 1969, having filed its Memorandum of Decision constituting its Findings of Fact and Conclusions of Law on the said motion for a preliminary injunction; and the Court, on October 29, 1969, having heard counsel for the respective parties on the form of order to be entered herein; now, therefore, it is

#### I

ORDERED, ADJUDGED AND DECREED that plaintiff's motion for a preliminary injunction to enjoin the acquisition by ITT of Grinnell is denied; and it is further

#### II

ORDERED, ADJUDGED AND DECREED that, pending final determination of this action by this Court, or until further order of this Court, ITT and Grinnell shall:

(1) Take all steps necessary to maintain Grinnell as a separate and viable company and make no changes in its operations likely to hinder a future divestiture of Grinnell.

(2) Preserve and protect all assets of Grinnell and refrain from disposing of such assets except in the ordinary course of business.

(3) Refrain from issuing any additional securities of Grinnell or incurring any additional indebtedness of Grinnell other than in the ordinary course of business.

(4) Retain separate and unencumbered all shares of Grinnell which ITT may own or receive.

(5) Take all steps necessary to maintain the independent management of Grinnell, and to that end refrain from causing or permitting any officer, director, employee or designee of ITT to serve as an officer or director of Grinnell, except that three directors of Grinnell may be persons who at the time of their original nomination are directors, officers or employees of ITT.

(6) Refrain from engaging in any reciprocal dealing on behalf of Grinnell.

(7) Refrain from engaging in the sale of ITT products in mechanical packages or systems with Grinnell sprinkler systems or components, power piping systems or pipe hangers, provided that nothing herein shall prevent Grinnell from selling ITT products of a kind sold by Grinnell on or before the date of this Order, together with Grinnell products or otherwise.

(8) Refrain from using the position and influence of The Hartford Fire Insurance Company to assist Grinnell in securing sales of its products.

(9) Refrain from using the corporate name "ITT-Grinnell", except as may be required in contracts or legal documents, or otherwise describing the corporate relationship of ITT and Grinnell in connection with any advertising, sales or promotional activities pertaining to the automatic sprinkler, pipe hanger or power piping operations of Grinnell.

(10) Refrain from using ITT's assets to finance the operations of Grinnell.

(11) Take or refrain from such other action as this Court, after hearing, may find necessary to achieve maximum preservation of the status quo consistent with the effective day-to-day operation of Grinnell; and it is further

### III

ORDERED, ADJUDGED AND DECREED that the provisions of this Order applicable to any defendant shall apply to each such defendant and each of its officers, directors and employees, and to each of its subsidiaries, successors and assigns, and to all other persons in active concert or participation with any such defendant who shall have received actual notice of this Order by personal service or otherwise; and it is further

### IV

ORDERED, ADJUDGED AND DECREED that jurisdiction is retained for the purpose of enabling any of the parties to this Order to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Order, for the modification of any provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.

---

## ORDER ON GOVERNMENT'S MOTION FOR PRELIMINARY INJUNCTION IN *HARTFORD* CASE

Plaintiff, United States of America, on August 1, 1969, having filed its complaint herein against defendants International Telephone and Telegraph Corporation (ITT) and The Hartford Fire Insurance Company (Hartford); plaintiff, on August 6, 1969, having filed a motion for a preliminary injunction; the Court, on September 18, 19, 22 and 23, 1969, having received evidence and heard

arguments by counsel for the respective parties; the Court, on October 21, 1969, having filed its Memorandum of Decision constituting its Findings of Fact and Conclusions of Law on the said motion for a preliminary injunction; and the Court, on October 29, 1969, having heard counsel for the respective parties on the form of order to be entered herein; now, therefore, it is

## I

ORDERED, ADJUDGED AND DECREED that plaintiff's motion for a preliminary injunction to enjoin the acquisition by ITT of Hartford is denied; and it is further

## II

ORDERED, ADJUDGED AND DECREED that, pending final determination of this action by this Court, or until further order of this Court, ITT and Hartford shall:

(1) Take all steps necessary to maintain Hartford as a separate and viable company and make no changes in its operations likely to hinder a future divestiture of Hartford.

(2) Preserve and protect all assets of Hartford and refrain from disposing of such assets except in the ordinary course of business.

(3) Refrain from issuing any additional securities of Hartford or incurring any additional indebtedness of Hartford other than in the ordinary course of business.

(4) Retain separate and unencumbered all shares of Hartford which ITT may own or receive, provided that nothing herein shall prevent ITT from disposing of any shares of Hartford that it held on October 21, 1969.

(5) Take all steps necessary to maintain the independent management of Hartford, and to that end refrain from causing or permitting any officer, director, employee or designee of ITT to serve as an officer or director of Hartford, except that three directors of Hartford may be persons who at the time of their original nomination are directors, officers or employees of ITT, and three directors of ITT may be persons who at the time of their original nomination are directors, officers or employees of Hartford.

(6) Refrain from engaging in any reciprocal dealing on behalf of Hartford.

(7) Refrain from using the position and influence of Hartford to assist Grinnell Corporation in securing sales of its products.

(8) Refrain from removing Hartford's "surplus surplus", or using Hartford's assets or "surplus surplus" to finance operations of ITT or any of ITT's other subsidiaries, provided that nothing herein shall prevent the payment by Hartford to ITT of dividends in an amount sufficient to cover the dividend requirements of the shares issued by ITT to Hartford shareholders in connection with this transaction.

(9) Refrain from transferring to Hartford any insurance coverage of ITT presently written by companies other than Hartford.

(10) Refrain from using the corporate name "ITT-Hartford", except as may be required in contracts or other legal documents, or otherwise describing the corporate relationship of ITT and Hartford in connection with any advertising, sales or promotional activities pertaining to the business operations of Hartford.

(11) Take or refrain from such other action as this Court, after hearing, may find necessary to achieve maximum preservation of the status quo consistent with the effective day-to-day operation of Hartford; and it is further

**802**

## III

ORDERED, ADJUDGED AND DE-CREED that the provisions of this Order applicable to any defendant shall apply to each such defendant and each of its officers, directors and employees, and to each of its subsidiaries, successors and assigns, and to all other persons in active concert or participation with any such defendant who shall have received actual notice of this Order by personal service or otherwise; and it is further

## IV

ORDERED, ADJUDGED AND DE-CREED that jurisdiction is retained for the purpose of enabling any of the parties to this Order to apply to this Court at any time for such further orders and directions as may be necessary or appropriate for the construction or carrying out of this Order, for the modification of any provisions thereof, and for the enforcement of compliance therewith and punishment of violations thereof.